[Cite as *Humanus Corp. v. Dir., Ohio Dept. of Job & Family Servs.*, 2020-Ohio-6940.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Humanus Corp., | : | |
| Appellant-Appellant, | : | |
| | : | No. 19AP-764 |
| v. | : | (C.P.C. No. 19CV-2148) |
| Director, Ohio Department of Job and Family Services, | : | (REGULAR CALENDAR) |
| | : | |
| Appellee-Appellee. | : | |
| | : | |

D E C I S I O N

Rendered on December 29, 2020

**On brief:** *Sara L. Rose, LLC*, and *Sara L. Rose*, for appellant. **Argued:** *Sara L. Rose*.

**On brief:** *Dave Yost*, Attorney General, and *Laurence R. Snyder*, for appellee. **Argued:** *Laurence R. Snyder*.

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Appellant, Humanus Corporation ("Humanus"), appeals from a judgment of the Franklin County Court of Common Pleas affirming the decision of the Ohio Unemployment Compensation Review Commission ("Commission") finding that Humanus is a liable employer under Ohio unemployment compensation law. Because the trial court did not abuse its discretion in finding reliable, probative, and substantial evidence supporting the Commission's decision, we affirm.

{¶ 2} Humanus contracts with educational professionals to fill positions at public and charter schools with which Humanus has an agreement to provide staffing services.

Pursuant to this arrangement, the educational professional executes two agreements with Humanus—a "Master Independent Contractor Agreement" ("Master Agreement") and "Addendum A: Independent Contractor Engagement Agreement" ("Engagement Agreement"). The Master Agreement sets forth the relationship between the educational professional, described therein as an "Independent Contractor," who engages Humanus on a non-exclusive basis for the purpose of obtaining referrals to Humanus' school clients in need of the skills possessed by the educational professional on a limited basis.

{¶ 3} The Master Agreement includes several provisions germane to the instant action. One such provision, entitled "Independent Contractor Agreement," states that as an independent contractor, the educational professional is not an employee of either Humanus or the school. Another provision, captioned "HIRING," states that the school, not Humanus, is the ultimate decisionmaker regarding hiring. A provision captioned "SUPERVISION" states that Humanus will not supervise the services performed by the educational professional; rather, supervisory responsibility rests with the school.

{¶ 4} A "COMPENSATION" provision states that the rate of compensation to be received by the educational professional for services performed for the school is set forth in the Engagement Agreement. The compensation provision requires the educational professional to submit weekly invoices and/or timecards for completed services to the school for review and approval and then submit copies of the approved invoices and/or timecards to Humanus, who then pays the educational professional. The provision warns that failure to timely provide this information to Humanus will result in delayed payment to the educational professional.

{¶ 5} A "PROFESSIONAL QUALIFICATION AND LICENSES" provision requires the educational professional to provide Humanus with a statement regarding his or her educational, salary, and work history. In addition, the provision requires the educational professional to secure and maintain, at his or her own expense, all licenses and certifications required for referrals sought by the educational professional and then provide copies of those documents to Humanus, who then submits them to the school. An "INSURANCE" provision requires the educational professional to maintain, at his or her own expense, malpractice and liability insurance and provide copies of those documents to Humanus, who may then forward them to the school.

{¶ 6}  A provision captioned "SUBCONTRACTORS" permits the educational professional to subcontract all or part of the services supplied to the school, provided that the educational professional verifies and validates that the subcontractor abides by the terms of the Master Agreement, including maintenance of proper licensure and insurance.

{¶ 7}  A "TERMINATION BY HUMANUS" provision entitles Humanus to terminate the Master Agreement with the educational professional at any time "for cause" without advance notice.  The Master Agreement defines "for cause" as: (1) failure to secure or maintain necessary licenses or certifications; (2) failure to secure or maintain insurance coverages required by the Master Agreement; (3) misrepresentation, dishonesty, or theft; (4) criminal conduct (other than minor traffic violations); (5) arbitrary or unreasonable failure to perform any term of the Master Agreement; (6) physical or mental incapacity preventing performance of essential job duties required by the school; (7) bankruptcy filing by or against the educational professional; (8) breach of the Master Agreement; and (9) any other actions or conduct by the educational professional that Humanus reasonably believes is detrimental to the conduct of its business.

{¶ 8}  A "TERMINATION BY INDEPENDENT CONTRACTOR" provision requires the educational professional, if terminating the Master Agreement prior to the expiration of the stated term, to provide Humanus 30 days' notice of the intent to terminate; early termination is considered a breach of the agreement for which Humanus may assess damages.  A provision entitled "NO CONFLICTING AGREEMENTS" prohibits an educational professional, without Humanus' prior written consent, from dealing directly or indirectly with any of the individuals or companies related to the provision of services to the school for a period of 24 months following termination of the Master Agreement.

{¶ 9}  The Engagement Agreement sets forth the specific school for which the educational professional will provide services as well as the compensation paid by Humanus for those services.  It describes the "duties to be performed" as the provision of services "as directed by Humanus' Client."  The Engagement Agreement reiterates the requirements for submission of invoices and timecards and the consequences for untimely compliance.  It also states that the educational professional must notify Humanus regarding the failure to perform scheduled services for the preceding week.

{¶ 10} The Engagement Agreement further provides that Humanus may terminate the educational professional's services for any of six reasons defined as "for cause": (1) commission of a felony; (2) commission of a crime constituting moral turpitude, such as fraud or crimes involving dishonesty; (3) failure to perform duties in a competent manner as determined by the school; (4) failure to comply with directives from the school, the school's board of directors or managing officers, or the school's written policies; (5) commission of any act that harms the school's reputation, standing, or credibility within the community in which it operates or with its customers or suppliers; and (6) failure to perform the duties assigned by Humanus or the school for any reason. The Engagement Agreement also includes a "Non-Circumvention Clause" which generally reiterates the non-compete provision contained in the Master Agreement.

{¶ 11} Humanus' contract with the client school is captioned "AGREEMENT FOR STAFFING SERVICES." Pertinent provisions state that Humanus screens qualified educational professionals prior to referring such individuals to the school. The decision whether to hire the educational professional rests with the school, not Humanus. Humanus is not responsible for and does not control or supervise the services provided by the educational professional to the school. The educational professional is considered an independent contractor, not an employee of either Humanus or the school.

{¶ 12} In addition to the agreements, the educational professional also executes a document entitled "WAIVER OF UNEMPLOYMENT COMPENSATION, WORKER'S COMPENSATION, AND DISABILITY INSURANCE." In that document, the educational professional acknowledges his or her status as a self-employed independent contractor, that he or she will not be supervised by Humanus, and that he or she waives the right to the aforementioned benefits.

{¶ 13} In November 2015, Denise Goodrich, an intervention specialist, executed a Master Agreement, an Engagement Agreement, and a benefits rights waiver in connection with Humanus' referral of Goodrich to one of its client schools. In August 2017, Humanus terminated those agreements after learning that Goodrich had allowed her teaching license to lapse. Thereafter, Goodrich applied for unemployment compensation benefits. Pursuant to an audit, appellee, the Director of the Ohio Department of Job and Family

Services ("ODJFS"), concluded that Goodrich was a Humanus employee in covered employment who was entitled to unemployment compensation benefits.

{¶ 14} As a result of the audit, ODJFS mailed an "Ohio Unemployment Tax Notification Determination of Employer's Liability and Contribution Rate Determination" (the "determination") to Humanus on December 1, 2017. The determination indicated that ODJFS considered Humanus an employer under R.C. 4141.01 subject to Ohio unemployment compensation law. Pursuant to R.C. 4141.25, ODJFS set Humanus' contribution rate at 2.7 percent for 2016 through 2018. The determination applied to the services provided by Goodrich, as well as "all individuals rendering similar services."

{¶ 15} In response to its request for reconsideration of the determination, Humanus was apprised via email from the Director's designee that due to the interrelationship between unemployment compensation benefits and tax liability, Humanus must timely appeal the benefits determination. Humanus was informed that the tax appeal would be held in abeyance until the benefits issue was resolved; thereafter, a reconsidered decision on the tax issue would be issued in accordance with resolution of the benefits issue.

{¶ 16} Humanus appealed the benefits determination to the Commission, which held a telephonic hearing on April 9, 2018. Goodrich did not appear at the hearing. Humanus presented the testimony of its Vice President of Related Services, Tom Gradowski, who testified that pursuant to its agreements with Goodrich, Humanus referred her to an Ohio charter school with whom Humanus contracted to provide educational staffing services. Humanus forwarded Goodrich's resume to the school, which then contacted Goodrich directly and performed necessary background checks. The decision to engage Goodrich was at the school's sole discretion. After being notified by the school that it had engaged Goodrich's services, Humanus had no further contact with the school. Goodrich submitted invoices to Humanus for the services she performed for the school; Humanus then billed the school at a higher rate than Goodrich was paid pursuant to her contract with Humanus.

{¶ 17} According to Gradowski, Humanus verified Goodrich's teaching licensure, but did not pay for it. Goodrich provided her own educational supplies. Further, with or without involvement of the school, Goodrich could subcontract the services she provided to another individual provided that individual was licensed in the same specialty area as

Goodrich. Gradowski further testified that Humanus did not have direction or control of the services performed by Goodrich. Humanus considered Goodrich to be an independent contractor and provided her a 1099 tax form; as a result, Humanus did not report her earnings to ODJFS.

{¶ 18} For its case, ODJFS submitted the affidavit of Ann Parker, an Unemployment Compensation Examiner 2, who averred that she reviewed Goodrich's benefits claim to determine whether she was employed by Humanus and whether the services Goodrich provided to Humanus were covered under Ohio unemployment compensation law. Parker attached to her affidavit several exhibits pertaining to her review. Among those exhibits were documents submitted by Gradowski concerning Goodrich's relationship with Humanus. (ODJFS Ex. 1, B.) Included in those documents was an email from Gradowski to Parker stating that no one from Humanus ever met with or interviewed Goodrich. This email also referenced an Internal Revenue Service 20-point test utilized in determining independent contractor status, with Gradowski's corresponding responses.

{¶ 19} On April 18, 2018, the hearing officer issued a decision affirming the Director's determination that Goodrich was an employee in covered employment with Humanus, but reversed the determination that Goodrich was entitled to unemployment compensation benefits. Specifically, the hearing officer found that Goodrich was ineligible for benefits based upon a disqualifying event (*i.e.*, her employment had been terminated for just cause, as she had failed to maintain a teaching license).

{¶ 20} Humanus sought review by the Commission, which was disallowed. Humanus' appeal to the Franklin County Court of Common Pleas was stayed pending resolution of the tax case. *Humanus Corp. v. Ohio Dept. of Job and Family Servs.*, Franklin C.P. No. 18CV-5250 (Oct. 31, 2018 Order of Stay).

{¶ 21} In a reconsidered decision issued September 12, 2018 in the tax case, the Director maintained the position set forth in the determination. Humanus appealed to the Commission, which held a hearing on January 24, 2019. Goodrich did not attend the hearing despite being subpoenaed to appear. The April 9, 2018 hearing transcript and April 18, 2018 benefits determination were incorporated into the record. In addition, Gradowski offered testimony consistent with that provided at the April 9, 2018 hearing, with some additions and clarifications. To that end, Gradowski testified that Humanus

simply refers educational professionals to schools with whom Humanus has staffing agreements. Humanus' business model provides schools flexibility to engage educational professionals in accordance with their staffing needs and allows educational professional flexibility to choose their own work schedule. The educational professionals do not meet personally with Humanus employees during the referral process.

{¶ 22} According to Gradowski, Humanus does not control the work schedules for the educational professionals and cannot compel them to work additional or fewer hours. In addition, Humanus has no knowledge, other than a general job description, of the services the educational professionals perform for the schools so as to permit Humanus to supervise them. The educational professionals contact the school directly to request time off. Humanus learns what hours the educational professionals work only after receiving their invoices. The school determines what level of training or licensure is required of the educational professionals. Humanus provides no training or orientation, does not conduct performance reviews, and never meets with the educational professionals. Gradowski also averred that many of the educational professionals provide services to multiple schools per week at various locations. The educational professionals do not provide Humanus with oral or written progress reports. Humanus neither pays for professional licensure and/or malpractice and liability insurance nor reimburses the educational professionals for their out-of-pocket expenditures. Humanus does not reimburse educational professionals for expenses incurred or supplies utilized in performing services for the school. The educational professionals' pay may be delayed if they do not timely submit invoices to the school or if the school delays payment to Humanus.

{¶ 23} Gradowski further testified that the educational professionals can make a profit by subcontracting their services to another for a lesser amount than they would receive under the Engagement Agreement. Conversely, the educational professionals may sustain a loss if the costs incurred in providing services to the school (such as professional licensure and malpractice and liability insurance) exceed the amount received under the Engagement Agreement, if the provision of services to the school ends sooner than anticipated, or if the school fails to pay for the services provided.

{¶ 24} As to Goodrich particularly, Gradowski testified that she called the school, not Humanus, to report if she were unable to provide services on a particular day. He further noted that in emails Goodrich referred to the school principal as her "boss" and referred to herself as a "consultant" with Humanus, not an employee. (Jan. 24, 2019 Tr. at 18, 19.)

{¶ 25} Megan Robinson, an ODJFS attorney, testified on behalf of ODJFS; she identified ODJFS's exhibits and provided brief explanations about them. On cross-examination, she was questioned about the notes Parker provided with regard to her interview of Goodrich in conjunction with her claim for unemployment compensation benefits. Robinson averred that according to Parker's notes, Goodrich reported that the school to which she provided intervention specialist services paid Humanus, not her, that she was paid hourly and biweekly from timesheets she submitted to Humanus that had to be signed by the school, and that her agreements with Humanus limited her ability to find employment for a period of 24 months after termination of those agreements. Parker's notes also included a finding that the Humanus agreements delegated direction and control of Goodrich's work to the school.

{¶ 26} When questioned about Parker's delegation of direction and control finding, Robinson averred that "there's plenty of evidence of delegation." *Id.* at 40. As an example, Robinson noted that Humanus exercised financial control over Goodrich, as Humanus paid her. Robinson also noted that the relationship between Goodrich and the school was arranged by Humanus. In addition, Robinson noted provisions of the Master Agreement regarding submission of weekly invoices and timecards to Humanus, and termination "for cause" without advance notice. Robinson acknowledged the provision of the Master Agreement permitting educational professionals to subcontract services but noted that such was limited to subcontractors with valid teaching licenses. As to the delegation of direction and/or control by Humanus to the school, Robinson pointed to the Engagement Agreement provision stating that "[d]uties that are performed by the independent contractor are generally described as follows: Provide services as directed by Humanus' client." *Id.* at 44.

{¶ 27} As evidence of the educational professionals' status as employees of Humanus rather than independent contractors, Robinson pointed to provisions of the

Humanus agreements regarding weekly invoicing to Humanus, timely notification by the educational professionals to Humanus regarding failure to perform scheduled services for the preceding week, and the 24-month prohibition on contact with the school following termination of the Humanus agreements. Robinson disagreed with Gradowski's testimony regarding the educational professionals' ability to make a profit or sustain a loss. To that end, Robinson averred that an hourly rate pay structure makes it difficult to demonstrate profit or loss and, in the present case, ODJFS did not uncover any evidence of either.

{¶ 28} On February 27, 2019, the Commission issued a decision affirming the Director's reconsidered decision. The Commission concluded that Goodrich was engaged in covered employment and Humanus was liable for unemployment compensation tax under Ohio law.

{¶ 29} Humanus appealed the Commission's decision to the Franklin County Court of Common Pleas pursuant to R.C. 4141.26. On October 8, 2019, the trial court issued a decision and judgment entry affirming the Commission's decision, finding that it was supported by reliable, probative, and substantial evidence. Humanus timely appeals, setting forth two assignments of error for our review:

> [I]. The trial court erred in ruling that the review commission's decision was supported by reliable, probative, and substantial evidence.
>
> [II]. The trial court erred in finding that Humanus was a temporary services agency under O.A.C. 4141-3-06.

{¶ 30} Before considering the merits of Humanus' assignments of error, we must first address the parties' dispute over the proper standard of review. Humanus asserts that this court must employ the same scope of review as the common pleas court under R.C. 4141.26(D)(2), that is, "consider the entire record and determine whether [the Commission's] order is supported by reliable, probative, and substantial evidence and [is] in accordance with law." (Humanus Brief at 7.) Humanus cites *Tzangas, Plakas & Mannos v. Admr., Ohio Bur. of Emp. Servs.*, 73 Ohio St.3d 694, 696 (1995) for the proposition that "[t]his court's scope of review is the same as the trial court." Humanus' reliance on *Tzangas* is misplaced, as that case addressed whether the Unemployment Compensation Board of Review's determination that an employee was terminated for "just cause," and thus

ineligible for unemployment compensation benefits pursuant to R.C. 4141.29(D)(2)(a), was unlawful, unreasonable, or against the manifest weight of the evidence. Addressing the applicable standard of review, the Supreme Court of Ohio noted that R.C. 4141.28(O), the statute setting forth the appeals process for "just cause" determinations, does not create distinctions between the scope of review of common pleas courts and appellate courts. *Id. Tzangas* did not address R.C. 4141.26(D)(2), the statute applicable to appeals from decisions of the Commission affecting the liability of an employer to pay unemployment compensation or the amount of such contribution.

{¶ 31} As ODJFS points out, this court has consistently held that there is a distinction between the scope of review of common pleas courts and appellate courts in R.C. 4141.26(D)(2) cases. We noted this distinction in *BRT Transp., LLC v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 14AP-800, 2015-Ohio-2048:

> The common pleas court's standard of review for appeals from decisions of the commission affecting the liability of an employer to pay unemployment compensation contributions or the amount of such contributions is set forth in R.C. 4141.26(D)(2), which states in pertinent part that a common pleas court may affirm a decision of the commission "if it finds, upon consideration of the entire record, that the determination or order is supported by reliable, probative, and substantial evidence and is in accordance with law." This court's role in reviewing a decision of the commission appealed pursuant to R.C. 4141.26 is narrower than the role of the trial court. *Miracle Home Health Care, L.C.C. v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-318, 2012-Ohio-5669, ¶ 18. As to issues of fact appealed pursuant to R.C. 4141.26, this court determines only if the common pleas court abused its discretion. An abuse of discretion requires more than an error in judgment. To find an abuse of discretion, we must conclude that the trial court's decision was without a reasonable basis and clearly wrong. *Id.* However, this court's review of questions of law is plenary. *Kate Corp. v. Ohio Unemp. Comp. Review Comm.*, 10th Dist. No. 03AP-315, 2003-Ohio-5668, ¶ 7.

*Id.* at ¶ 15.

{¶ 32} Thus, pursuant to *BRT*, *Miracle Home Health Care, LLC v. Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 12AP-318, 2012-Ohio-5669, and other decisions of this court, we reaffirm our long-standing position that in R.C. 4141.26(D)(2) cases, our review of a trial court's decision is plenary with regard to questions of law, but limited to

determining whether the trial court abused its discretion as to factual issues. *See, e.g.*, *BNA Constr., Ltd. v. Dir. of Ohio Dept. of Job & Family Servs.*, 10th Dist. No. 16AP-317, 2017-Ohio-7227, ¶ 24-25; *McConnell v. Ohio Bur. of Emp. Servs.*, 10th Dist. No. 95APE03-262, (Oct. 5, 1995); *Eisenhour v. State Unemployment Comp. Bd. of Review*, 10th Dist. No. 97APE03-349 (Aug. 12, 1997). Having determined the appropriate standard of review, we now consider the merits of Humanus' assignments of error.

{¶ 33} In its first assignment of error, Humanus argues that the trial court erred in concluding that the Commission's decision finding Humanus a liable employer under Ohio unemployment compensation law was supported by reliable, probative, and substantial evidence. Specifically, Humanus claims that the trial court erred in affirming the Commission's classification of Goodrich and other persons rendering similar services as employees of Humanus, rather than independent contractors.

{¶ 34} Ohio law requires employers to contribute to Ohio's unemployment compensation fund. R.C. 4141.09; R.C. 4141.23. ODJFS maintains a separate account for each employer's contributions and determines the rate at which an employer must make contributions to that account. R.C. 4141.24; R.C. 4141.25. The contribution rate is applied to the wages paid by the employer. *See* R.C. 4141.25. Accordingly, a necessary part of this process is determining whether individuals performing services for an employer are employees or independent contractors. The definition of "Employer" includes corporations that have "in employment at least one individual." R.C. 4141.01(A)(1)(a). R.C. 4141.01(B)(1) defines "Employment" as follows:

> [S]ervice performed by an individual for remuneration under any contract of hire, written or oral, express or implied, * * * unless it is shown to the satisfaction of the director that such individual has been and will continue to be free from direction or control over the performance of such service, both under a contract of service and in fact. The director shall adopt rules to define "direction or control."

{¶ 35} The alleged employer bears the burden of proving that the worker is not an employee, and, thus, that it need not contribute to the unemployment compensation fund. *Miracle*, 10th Dist. No. 12AP-318, 2012-Ohio-5669 at ¶ 21, citing *Peter D. Hart Research Assocs., Inc. v. Ohio Bur. of Emp. Servs.*, 10th Dist. No. 95APE06-736 (Dec. 28, 1995).

{¶ 36} Consistent with the statutory definition of employment, Ohio Adm.Code 4141-3-05(A) provides:

> [A] worker is in employment when an "employer-employee" relationship exists between the worker and the person for whom the individual performs services and the director determines that:
>
> (1) The person for whom services are performed has the right to direct or control the performance of such services; and
>
> (2) Remuneration is received by the worker for services performed.

{¶ 37} Ohio Adm.Code 4141-3-05(B) sets forth 20 factors as "guides" for determining whether sufficient direction or control exists to create an employer-employee relationship. "These factors are drawn from the common law, where they are used to distinguish between employees and independent contractors." *Miracle Home* at ¶ 22. The factors, which "must be considered in their totality," include:

> (1) The worker is required to comply with the instructions of the person for whom services are being performed, regarding when, where, and how the worker is to perform the services;
>
> (2) The person for whom services are being performed requires particular training for the worker performing services;
>
> (3) The services provided are part of the regular business of the person for whom services are being performed;
>
> (4) The person for whom services are being performed requires that services be provided by a particular worker;
>
> (5) The person for whom services are being performed hires, supervises or pays the wages of the worker performing services;
>
> (6) A continuing relationship exists between the person for whom services are being performed and the worker performing services that contemplates continuing or recurring work, even if not full time;
>
> (7) The person for whom services are being performed requires set hours during which services are to be performed;

(8) The person for whom services are being performed requires the worker to devote himself or herself full time to the business of the person for whom services are being performed;

(9) The person for whom services are being performed requires that work be performed on its premises;

(10) The person for whom services are being performed requires that the worker follow the order of work set by the person for whom services are being performed;

(11) The person for whom services are being performed requires the worker to make oral or written progress reports;

(12) The person for whom services are being performed pays the worker on a regular basis such as hourly, weekly or monthly;

(13) The person for whom services are being performed pays expenses for the worker performing services;

(14) The person for whom services are being performed furnishes tools, instrumentalities, and other materials for use by the worker in performing services;

(15) There is a lack of investment by the worker in the facilities used to perform services;

(16) There is a lack of profit or loss to the worker performing services as a result of the performance of such services;

(17) The worker performing services is not performing services for a number of persons at the same time;

(18) The worker performing services does not make such services available to the general public;

(19) The person for whom services are being performed has a right to discharge the worker performing services;

(20) The worker performing services has the right to end the relationship with the person for whom services are being performed without incurring liability pursuant to an employment contract or agreement.

Ohio Adm.Code 4141-3-05(B)(1) through (20).

{¶ 38} "When present, each of these factors serves to indicate some degree of direction or control. The degree of importance of each factor varies depending on the occupation and the factual context in which the services are performed." Ohio Adm.Code 4141-3-05(B).

{¶ 39} Here, the trial court found that the agreements between Humanus and the educational professionals provide Humanus with the right to direct or control the educational professionals' work. In so finding, the trial court rejected Humanus' argument that the 20-factor "guides" set forth in Ohio Adm.Code 4141-3-05(B)(1) through (20) for determining independent contractor status should have been analyzed vis-a-vis the educational professionals and the schools, not the educational professionals and Humanus.

{¶ 40} In so concluding, the trial court relied primarily on this court's decision in *Miracle Home*, 10th Dist. No. 12AP-318, 2012-Ohio-5669. The court stated:

> In *Miracle Home,* the Tenth District affirmed the Commission's determination that Miracle Home Health Care, LLC ("Miracle"), a Medicare/Medicaid home-health agency, employed aides it placed in homes to provide direct home-health services to individuals. In that regard, individuals in need of home-health aides would engage Miracle, and Miracle would offer placement to an aide, with whom Miracle had a contract.
>
> The contract between Miracle and its home-health aides stated, in part:
>
> "You as a contractor will be under direct supervision by Miracle, and will report to our management. Miracle management will have full control of coordinating and evaluating contractors [sic] work on daily [sic] basis. And Individual [sic] from Miracle will be appointed to direct and carefull [sic] supervision."
>
> But in practice, Miracle did not supervise the aides daily and only periodically checked in with its clients to inquire about quality of care. Miracle did require aides to submit weekly, written reports in accordance with Ohio and federal law. Every two weeks, Miracle paid the aides for the number of hours worked, as reflected on those reports. Finally, while the aides under contract with Miracle were free to work for other home-health agencies and to have their own clients, the Tenth District concluded that Miracle had 'the ability to direct all

> aspects of how the home caregivers render services to Miracle's clients.' *Miracle Home* at ¶ 23.
>
> In arguing the 20 factors, Miracle emphasized that (B)(5), (6), (19), and (20) refer to the 'person for whom services are being performed' and argued that those factors should have been evaluated vis-a-vis the aides and the clients, not the aides and Miracle. The Tenth disagreed:
>
> "The home caregivers contract with Miracle, not the client, for work. If Miracle does not engage a home caregiver's services for a client, the home caregiver performs no services for that client. Consequently, Miracle is the entity for whom the home caregiver ultimately provides his or her services. We thus find that the trial court did not abuse its discretion in focusing on the home caregivers' relationship with Miracle in applying Ohio Adm.Code 4141-3-05(B)(5), (6), (19), and (20)."

(Oct. 8, 2019 Decision & Entry at 9-10).

{¶ 41} The trial court determined that as in *Miracle Home,* Goodrich contracted with Humanus, not the school, for work, and that pursuant to those agreements, Humanus established itself as Goodrich's employer, and as such, delegated certain of its rights to direct and control her work to her assigned school, i.e., Humanus' client. Specifically, the court found that the agreements established Humanus' control over where and for how long Goodrich would work, how much she would be paid, and the parameters and timeframe for obtaining payment. In addition, the agreements established Humanus' right to terminate Goodrich's services if it or the school were dissatisfied with her, which included engaging in conduct "Humanus reasonably believed is detrimental to its business," failure to follow the school's "directives" or "written policies" and failure "to perform the duties assigned by Humanus or Humanus' Client(s) for any reasons." (Decision & Entry at 11.) The court further found that although the agreements established the school's right to "supervise the services" provided by Goodrich, the right to terminate the services always remained with Humanus. In addition, the trial court found that Humanus could direct all aspects of how Goodrich rendered services to Humanus' client school and that, absent Humanus, Goodrich would have performed no services for Humanus' client. The court concluded that "Humanus is the entity for which Ms. Goodrich ultimately provided services, and the Commission did not err in focusing on that relationship when it applied the 20 factors." *Id.*

{¶ 42} The trial court also rejected Humanus' claim that the Commission misapplied the Ohio Adm.Code 4141-3-05(B)(1) through (20) factors. Initially, the trial court noted that ODJFS never asserted that all 20 factors weighed in favor of an employment determination. Further, in response to Humanus' argument that Goodrich was an independent contractor by virtue of contract provisions permitting her to subcontract her services, the trial court noted that those same provisions limited subcontracting only to individuals who agreed to adhere to the terms of the agreements. The trial court also disagreed with Humanus' contentions regarding Goodrich's potential for profit and loss. Specifically, the trial court found that the provision in the Master Agreement assessing damages to Goodrich for failure to give 30 days' notice of termination, even if enforceable, was not the type of loss contemplated by the 20-factor analysis. The trial court further found that the hourly rate pay arrangement utilized by Humanus was not the type of compensation structure associated with profit and loss. The trial court ultimately found "no error in the degree of importance the Commission gave to any one factor, considering the context." (Decision & Entry at 14.)

{¶ 43} On appeal, Humanus argues that neither the Commission nor the trial court examined the 20 factors set forth in Ohio Adm.Code 4141-3-05(B)(1) through (20). Humanus takes particular issue with the trial court's finding regarding "the degree of importance the Commission gave to any one factor." To this point, Humanus argues that the Commission "provided no discussion of the twenty factors, or what importance it put on each." (Humanus' Brief at 15.) Relatedly, Humanus maintains that the Commission and the trial court overlooked 12 of the 20 "biggest factors," *i.e.*, Ohio Adm.Code 4141-3-05(B)(3), (4), (5), (8), (10), (11), (13), (14), (16), (17), (18), and (20) which purportedly support Goodrich's classification as an independent contractor. (Humanus Brief at 20.)

{¶ 44} Humanus provides no authority for its proposition that the Commission and/or the trial court must specifically address and make findings as to each of the 20 factors. Further, Ohio Adm. Code 4141-3-05(B) does not require a strict mathematical application of the factors. Rather, it provides that "[w]hen present, *each* of these factors serves to indicate some degree of direction or control," and that "[t]he degree of importance of *each* factor varies depending on the occupation and the factual context in which the

services are performed."  (Emphasis added.)  Thus, each determination must be based on the unique characteristics of the occupation and the services being performed.

{¶ 45} Moreover, the record reveals that both the Commission and the trial court considered the 20 factors.  In closing argument at the January 24, 2019 tax hearing, counsel for Humanus addressed each of the 20 factors and pointed to evidence which purportedly established that the educational professionals are independent contractors rather than employees of Humanus.  In response, counsel for ODJFS averred, "is every single one of these factors met in this case?  No.  Are the vast majority of the factors met in this case, on the basis of the black and white terms of both the [Master Agreement], the [Engagement Agreement], and the answers provided by * * * the testimony here today and the testimony provided in the benefits case?  Absolutely."  (Tr. at 66.)

{¶ 46} In its decision, the Commission set forth the applicable law to be considered in determining whether Humanus is a liable employer, including consideration of the 20 factors set forth in Ohio Adm.Code 4141-3-05(B)(1) through (20).  The Commission concluded:

> Humanus Corp. maintained that Ms. Denise Goodrich was an independent contractor and argued that their business relationship with claimant exhibited many of the characteristics of an independent contractor, as detailed by the Ohio Administrative Code.  However, the evidence and testimony presented establishes that Humanus Corp. maintained direction and control of Ms. Denise Goodrich in a manner consistent with an employment relationship. * * *
>
> A thorough review of the record in this matter establishes that the Director properly found [the] individual identified in the audit to be a covered employee.  The Director also established the proper liability rates for the employer.

(Feb. 27, 2019 Commission Decision at 6.)

{¶ 47} Contrary to Humanus' contention, the Commission's citation to the Ohio Administrative Code factors, its reference to Humanus' argument that its relationship with Goodrich exhibited many of the characteristics of an independent contractor, "*as detailed by the Ohio Administrative Code*," and its conclusion that Humanus "*maintained direction and control*" of Goodrich establishes that it examined the 20 factors and the record evidence pertaining to those factors.  (Emphasis added.)  *Id.*  Similarly, the trial court's

citation to the 20 factors, its reference to Humanus' arguments regarding those factors, and its analysis and conclusions pertaining to those arguments establishes that it examined and applied them to the evidence presented. Thus, any argument that the Commission and the trial court did not consider the factors is not supported by the record.

{¶ 48} Humanus' main contention is that the trial court abused its discretion in finding that the Commission's determination was supported by reliable, probative, and substantial evidence. Humanus claims that the Commission focused on only a few of the Ohio Administrate Code factors to the exclusion of other, more pertinent factors. Indeed, Humanus argues that "[w]hen considering the twenty factors as a whole, it is evident the contracted professionals were not employees of Humanus. They controlled their own hours, controlled their own expenses, controlled the order of work performed, controlled their own profit and loss, and controlled whether to perform the work personally or subcontract it out." (Humanus Brief at 26.)

{¶ 49} Like the trial court, we find Humanus' arguments regarding the potential for profit and loss and the ability to subcontract work unavailing. As noted by the trial court, Humanus' hourly pay structure is typically not one associated with the potential for profit and loss. Further, the agreements limit subcontracting to individuals who adhere to the terms of the Master Agreement. Further, Humanus fails to acknowledge the provisions of the Master and Engagement Agreements that support the finding by the Commission and the trial court that the educational professionals with whom it contracts are its employees. The agreements allow Humanus to set the parameters and timeframe for the services engaged; require particular training and submission of supporting documentation; set the hourly rate of pay; require submission of weekly invoices to obtain that pay; require notification of the failure to perform scheduled services; terminate the agreements without advance notice for any one of a number of reasons; and prohibit contact with a client school for 24 months following termination of the agreements.

{¶ 50} Humanus also contends that neither the Commission nor the trial court refuted the cases it cited in support of its position. Review of the Commission and trial court decisions substantiate Humanus' assertion in this regard; however, we surmise that the failure to address those cases was because they are factually distinct from, and thus inapplicable to, the present case. *See, e.g., Marcus Roach Express, LLC v. Dir., Ohio Dept.*

*of Job & Family Servs.*, 11th Dist. No. 2019-P-0054, 2019-Ohio-5414 (unemployment benefits appeal, truck driver); *Eisenhour*, 10th Dist. No. 97APE03-349 (Aug. 12, 1997) (unemployment appeal, home health aide); *Golden v. Kearse*, 12th Dist. No. CA98-08-164 (employer workers' compensation liability, truck driver); *Bookwalter v. Prescott*, 168 Ohio App.3d 262, 2006-Ohio-585 (6th Dist.) (employer worker's compensation liability, truck driver); *Evans v. Dir., Ohio Dept. Job & Family Servs.*, 10th Dist. No. 14AP-743, 2015-Ohio-3842 (unemployment tax appeal, truck driver).  Ohio Adm.Code 4141-3-05(B) requires consideration of the factors of each case independently when determining whether an individual is free from "direction or control."

{¶ 51} Humanus also criticizes the trial court's reliance on *Miracle Home*, 10th Dist. No. 12AP-318, 2012-Ohio-5669, arguing that it is factually distinguishable and thus inapplicable to the present case.  We find no reversible error in the trial court's citation to *Miracle Home.*  The trial court relied on that decision for the proposition that the language of an alleged independent contractor agreement may not reflect the reality of the relationship between the contracting parties and to dispel Humanus' theory that Goodrich provided services to the school, not Humanus.  As noted by the trial court, *Miracle Home* demonstrates that when an individual's contract is with an entity who subsequently refers that individual to the entity's clients, it is the referring entity, not the client, for whom the individual provides services.  Humanus also avers that *Miracle Home* applied "the wrong standard in reviewing the trial court's decision."  (Humanus' Brief at 29.)  We have already determined that the standard of review advocated by Humanus is incorrect and that the appropriate standard of review, abuse of discretion, was employed in *Miracle Home.*

{¶ 52} Finally, Humanus contends that the Commission and the trial court erred in relying on the evidence and determination in the benefits case in deciding the tax case.  We need not address this issue, however, as Humanus withdrew it at oral argument.

{¶ 53} For all the foregoing reasons, we conclude that the trial court did not abuse its discretion in finding reliable, probative, and substantial evidence supporting the Commission's determination with respect to classification of Goodrich as an employee of Humanus.

{¶ 54} The first assignment of error is overruled.

{¶ 55} In its second assignment of error, Humanus claims that the trial court erred in finding that Humanus is a temporary services agency under Ohio Adm.Code 4141-3-06. Preliminarily, we note that the trial court did not make such a finding. The trial court merely stated that "Ohio Adm.Code 4141-3-06(C), applicable to 'temporary services agencies,' is instructive." (Decision & Entry at 14.) Further, the trial court decided the case under the rubric of R.C. 4141.01(B)(1) and Ohio Adm. Code 4141-3-05, not Ohio Adm.Code 4141-3-06.

{¶ 56} The second assignment of error is overruled.

{¶ 57} Having overruled Humanus' two assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BRUNNER and NELSON, JJ., concur.

_____